# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABEL MORENO, | 1:09-CV-00689 LJO SMS HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES HARTLEY, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Los Angeles, following his conviction by jury trial on February 19, 1997, of assault with a caustic chemical, child abuse, conspiracy to torture, conspiracy, and aggravated mayhem. See Petition at 2. Petitioner was sentenced to serve an indeterminate term of life in state prison plus one year and four months with the possibility of parole. Id.

On May 3, 2007, a parole suitability hearing was held before the California Board of

1

Parole Hearings ("Board") to determine Petitioner's eligibility for parole. See Hearing Transcript attached to Petition (hereinafter "Transcript"). Petitioner attended the hearing and was represented by his attorney. Id. At the conclusion of the hearing, the Board denied parole and deferred rehearing for two years. Id. at 88.

On May 12, 2008, Petitioner filed a petition for writ of habeas corpus in the Los Angeles County Superior Court challenging the Board's decision. See Answer, Exhibit 1. On July 23, 2008, the petition was denied in a reasoned decision. See Answer, Exhibit 2. Petitioner then filed a habeas petition in the California Court of Appeals, Second Appellate District, on September 18, 2008. See Answer, Exhibit 3. The petition was denied on November 6, 2008. See Answer, Exhibit 4. On November 20, 2008, Petitioner filed a petition for review in the California Supreme Court. See Answer, Exhibit 5. On January 14, 2009, the petition was denied. See Answer, Exhibit 6.

On March 18, 2009, Petitioner filed the instant petition for writ of habeas corpus in this Court. The petition for writ of habeas corpus challenges the 2007 decision of the Board denying parole. Petitioner claims there is not "some evidence" to show he is currently a dangerous risk to society, and the Board's continued reliance on the commitment offense and circumstances surrounding the commitment offense violates the Fifth and Fourteenth Amendments. On July 14, 2009, Respondent filed an answer to the petition. Petitioner filed a traverse to Respondent's answer on August 14, 2009.

## FACTUAL BACKGROUND[1]

On August 5, 1995, at approximately 2:30 p.m., Roumelia Hernandez was waiting at a bus stop at the corner of Gage and Cesar Chavez with her son, Abel Ordaz. Abel was six or seven years old. The two had just parted from Petitioner, who was Abel's father.

Hernandez and Petitioner had lived together until December, 1994, when they separated. After he moved out of Hernandez's home, Petitioner twice tried to harm Hernandez, once by putting a rag soaked in chemicals under her nose, and once by hitting her on the back of her head

---

[1] The information is derived from the factual summary as set forth in the parole hearing proceedings. See Transcript at 14-22.

2

with an unknown object, which split her head open and required 14 stitches to close. The two nevertheless maintained some contact because of their son. The met on August 5th because Petitioner wanted to buy some shoes for Abel.

As a bus approached the stop where Hernandez and Abel were waiting, a man by the name of Savala ran in front of the bus forcing the bus driver, Janet Mitchell, to brake to avoid hitting him. Savala was holding a 16-ounce clear tumbler in his hand. Mitchell stopped the bus and opened the door. As Hernandez and Abel began to board the bus, Savala threw a liquid into Hernandez's face. Mitchell realized the liquid was acid when she saw the damage to Hernandez's face. The acid was eating through Hernandez's clothes. In addition, some of the acid had splashed onto Abel's arm and shirt. Hernandez and Abel began screaming in pain. Mitchell saw Savala throw the tumbler in a trash can and run away.

Salvador Escobar was driving on Cesar Chavez and also saw Savala throw something into a trash can and run away. Escobar heard a scream, saw a woman with red substance resembling blood on her face and decided to follow Savala. Escobar caught up with him and subdued him with the help of two other men.

Abel left and returned with Petitioner, who put his coat around Hernandez. Petitioner also poured water onto Hernandez's face. Paramedics took Hernandez and Abel to the hospital. Sheriff's deputies arrested Savala and recovered a plastic tumbler containing a small amount of liquid from the nearby trash can.

Mitchell later identified Savala as the man who threw the liquid on Hernandez's face. The liquid was later determined to be sulfuric acid. Hernandez was shown a six-pack photograph line-up while in the hospital, and identified Savala as the man who threw the acid on her.

The incident was also witnessed by Jose Espinoza, who worked in a nearby television shop. He saw Savala approach a bus and throw the contents of a brown paper bag into the face of a woman, then throw the bag into a trash can and run away. Espinoza went to the scene and saw Petitioner with whom he had once worked, and Petitioner was throwing water on Hernandez's face.

Espinoza later told police that about three months before the incident, Petitioner had

3

attempted to hire three homeless people to throw acid on Hernandez. Espinoza testified that Petitioner said that he wanted to throw acid on her in order to get her money. Espinoza also testified that Petitioner said that he had tried to hire a mutual friend to throw the acid, but the friend didn't want to do it.

Geraldine Luna, who lived with Savala, testified that she had been in a van with Petitioner and Savala on the night of August 4th, the night before the acid-throwing incident, and heard Petitioner tell Savala that he did not want Savala to back out of the job that they had agreed to, and that Petitioner wanted the woman to stay blind. Luna and Savala had both used heroin that day.

Luna also testified that the next morning, she went with Savala to a gas station on the corner of Cesar Chavez and Rowan. Luna left for about 20 minutes and when she returned, she noticed a beige plastic grocery bag by the gas pumps. Savala told Luna not to knock over the bag. Savala left the gas station. Petitioner then came to the gas station and asked where Savala was. Luna told him Savala would return shortly. Petitioner became angry. He said that he had some money for Savala, who was going to do something for him. About 10 to 15 minutes later, Savala returned to the gas station. Luna told him that Petitioner was looking for him. Luna and Savala walked away from the gas station. At some point, Luna carried the plastic bag which contained a 16-ounce Tupperware cup with liquid in it. Savala told Luna not to drop the bag.

After an unsuccessful attempt to borrow money to purchase heroin, Luna and Savala returned to the area of the gas station. Luna saw Petitioner, the woman and the little boy standing at a nearby bus stop. She pointed Petitioner out to Savala. Luna saw Petitioner and Savala meet and talk to each other. Luna did not see Savala again that day.

Detective Zamora of the Los Angeles Sheriff's station investigated the case involving Hernandez and Abel. After learning of Petitioner's possible involvement in the incident, Detective Zamora interviewed Petitioner. Petitioner waived his Miranda rights and denied ever hiring anyone to throw acid on Hernandez.

After Detective Zamora told Petitioner that people had come forward to say that Petitioner had done so, he changed his story. He admitted that he hired Savala to splash

Hernandez with rust remover. Petitioner stated that he wanted to harm Hernandez because she had used him for money. Petitioner said that Hernandez had played with his mind by pretending to care for him, and that she had been seeing someone else when she was living with Petitioner. Petitioner admitted that he had been trying to hire someone to throw acid on her for the past three or four months. Petitioner also told Detective Zamora about two prior incidents involving Hernandez. During one incident, Petitioner and Hernandez got into a fight and he hit her on the head with some object, splitting her head open. In the second incident, Petitioner put some paint thinner on a sock and tried to put it over Hernandez's nose.

Detective Zamora interviewed Savala on the morning of August 7. Savala waived his Miranda rights and denied ever splashing a woman with acid. On the morning of August 8, Detective Zamora interviewed Savala again. After Savala waived his Miranda rights, he again denied splashing a woman with acid. Detective Zamora told Savala that people had come forward to say that he was involved, and Savala admitted splashing a woman with acid.

Hernandez stayed in a hospital for almost two months after the acid was thrown on her. Dr. Bruce Zawacki, a surgeon who specialized in acute burns, treated Hernandez. He testified that she had very deep chemical burns over her face, neck, right shoulder, right arm, chest and back. About 13 to 15 percent of the surface area of Hernandez's body had suffered a deep burn which required removal of the dead skin, and grafting of new skin. Almost all of Hernandez's face was dead tissue that had to be removed and replaced by donor skin and then later by Hernandez's own skin. Skin had to be removed from her stomach, back and legs to graft on to the burnt portions of her body. She had a total of five surgeries before her initial release from the hospital. After her release, she had three more operations, and more were planned. As a result of her injuries to her eyes, she could no longer read and the scars on her body were permanent. Abel suffered third-degree burns and stayed in the hospital for two days. He had permanent scars on his arm and leg.

At trial, Petitioner denied his statements to Detective Zamora and denied any involvement in the acid-throwing incident. He also denied the two other incidents with Hernandez, stating that he only wanted her to smell the chemical to identify it, and that Hernandez hurt her head in a fall

in the bathtub. Savala did not present a defense.

## DISCUSSION

I.      Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for her habeas petition because she meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

1  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
2  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this
3  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
4  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other
5  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
6  principles set forth by the Supreme Court at the time the state court renders its decision." Id.
7       Finally, this Court must consider whether the state court's decision was "contrary to, or
8  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at
9  72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
10 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
11 Court on a question of law or if the state court decides a case differently than [the] Court has on a
12 set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.
13 at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
14 state court identifies the correct governing legal principle from [the] Court's decisions but
15 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at
16 413.
17      "[A] federal court may not issue the writ simply because the court concludes in its
18 independent judgment that the relevant state court decision applied clearly established federal
19 law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.
20 A federal habeas court making the "unreasonable application" inquiry should ask whether the
21 state court's application of clearly established federal law was "objectively unreasonable." Id. at
22 409.
23      Petitioner has the burden of establishing that the decision of the state court is contrary to
24 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
25 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
26 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
27 state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th
28 Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

1  AEDPA requires that we give considerable deference to state court decisions. The state
2  court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's
3  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*,
4  537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

5  In this case, because the California Supreme Court summarily denied the habeas petition,
6  this Court must "look through" that decision to the decisions below. Ylst v. Nunnemaker, 501
7  U.S. 797, 804-05 & n.3 (1991).

8  II.    Review of Petition

9  A parole release determination is not subject to all the due process protections of an
10 adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see
11 also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural
12 protections that particular situations demand). "[S]ince the setting of a minimum term is not part
13 of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not
14 constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at
15 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole
16 board proceeding, the only procedural process to which an inmate is entitled is: 1) the inmate
17 must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be
18 afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; and 3) if the inmate is denied
19 parole, the inmate must be told why "he falls short of qualifying for parole." Id.

20 As to these procedural protections, Petitioner was provided with all that is required. He
21 was given advanced written notice of the hearing, an opportunity to submit materials for the
22 Board's consideration, an opportunity to be heard, representation by an attorney, and a written
23 decision explaining the reasons parole was denied.

24 "In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not
25 comport with 'the minimum requirements of procedural due process,' unless the findings of the
26 prison disciplinary board are supported by *some evidence* in the record.' 472 U.S. 445, 454
27 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass v. California Board of
28 Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (italics added); Irons v. Carey, 505 F.3d 846,

851 (9th Cir.2007), *quoting* Hill, 472 U.S. at 457 ("We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'"). In assessing "whether a state parole board's suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." Irons, 505 F.3d at 851. Here, the Court must look to California law and review the record. In reviewing the record and determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Sass, 461 F.3d at 1128.

Further, the California Supreme Court more recently stated:

> "[T]he relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after the commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

In re Lawrence, 44 Cal.4th 1181, 1221 (2008). The nature of the commitment offense "does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." Id. at 1214.

In denying parole in this case, the Board based its decision on the following factors: 1) The nature and gravity of the commitment offense; 2) Previous record of violence; and 3) Unstable social history. See Transcript at 76-88.

The Board relied primarily on the facts of the commitment offense in determining that

Petitioner committed the offense in an especially heinous, atrocious or cruel manner.[2] The superior court found there was at least some evidence supporting this finding. The superior court noted that the victim's suffering was extreme. See Answer, Exhibit 2; 15 Cal. Code Regs. § 2402(c)(1)(D). The victim sustained acid burns to the face which required two months of hospitalization, skin grafting, multiple surgeries and permanent scarring. See Answer, Exhibit 2. In addition, the superior court noted that multiple victims were attacked and injured. Id.; 15 Cal. Code Regs. § 2402(c)(1)(A). Given the record, the superior court's determination that some evidence supported the Board's finding that the offense was especially heinous, atrocious or cruel as to be a sufficient basis to deny parole was not unreasonable.

The Board also determined that Petitioner's previous record of violence demonstrated Petitioner remained a risk of danger to the public. The superior court also found that some evidence supported this finding. See Answer, Exhibit 2. Petitioner had on previous occasions "inflicted or attempted to inflict injuries on the same victim." Id. On one occasion, Petitioner placed a rag that had been soaked in chemicals under the victim's nose. On another occasion, he split the victim's head open with an object and the injury required fourteen stitches. The superior court concluded that his record of violence provided at least some evidence to "indicat[e] that petitioner continues to pose an unreasonable risk of danger to society if released from prison." Id.; 15 Cal. Code Regs. §§ 2402(c)(2), (3). The superior court's conclusion was not unreasonable.

The Board also considered positive factors favoring parole release. Petitioner had viable parole plans as far as a residence and a psychological evaluation found him to be a low risk of

---

[2] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
    (C) The victim was abused, defiled or mutilated during or after the offense.
    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

1 reoffending. See Transcript at 79, 81. However, the Board also noted that Petitioner had only
2 programmed in a limited manner, failed to develop marketable skills, and failed to upgrade
3 educationally. Id. at 79. Also, the Board found the psychological report to be disconcerting. The
4 psychologist found only a low risk for reoffending but also noted anti-social behavior and a
5 failure by Petitioner to discuss the life crime and his responsibility. Id. at 80. In light of the
6 negative factors, the Board determined that Petitioner remained an unreasonable risk of danger to
7 the public. The state court finding that some evidence supported this determination was not
8 unreasonable.

9       Petitioner argues that the Board's continuing reliance on the immutable circumstances of
10 the underlying offense violates his due process rights. In Biggs v. Terhune, 334 F.3d 910, 916-17
11 (9th Cir.2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging
12 factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the
13 rehabilitative goals espoused by the prison system and could result in a due process violation."
14 However, this was only Petitioner's third parole suitability hearing. In addition, the
15 circumstances of the offense, while significant, were not the only reasons for the Board's
16 decision. The Board found Petitioner's prior violent history and his unstable social history to be
17 additional factors indicating Petitioner would pose an unreasonable danger to public safety
18 should he be presently released. Moreover, the concerns raised in Biggs are not present in this
19 case as Petitioner was sentenced to a minimum indeterminate term of life imprisonment.

20       In light of the above, it cannot be said that the state court resolution of Petitioner's claims
21 "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly
22 established Federal law, as determined by the Supreme Court of the United States" or "resulted
23 in a decision that was based on an unreasonable determination of the facts in light of the evidence
24 presented in the State Court proceeding." 28 U.S.C. § 2254(d).

### RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     The petition for writ of habeas corpus be DENIED; and
2.     Judgment be entered in favor of Respondent.

1  This Findings and Recommendations is submitted to the assigned United States District
2  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of
3  the Local Rules of Practice for the United States District Court, Eastern District of California.
4  Within thirty (30) days after being served with a copy, any party may file written objections with
5  the court and serve a copy on all parties.  Such a document should be captioned "Objections to
6  Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served
7  and filed within ten (10) court days (plus three days if served by mail) after service of the
8  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §
9  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time
10 may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th
11 Cir. 1991).

12 IT IS SO ORDERED.

13 **Dated:   August 31, 2009**                        /s/ Sandra M. Snyder
                                                       UNITED STATES MAGISTRATE JUDGE